Arlene FLAX, et al.

v.

W.S. POTTS, et al.

Civ. A. No. CA 4–4205–E.

United States District Court,
N.D. Texas,
Fort Worth Division.

June 17, 1983.

L. Clifford Davis, Fort Worth, Tex., William L. Garrett, Dallas, Tex., for plaintiffs.

David B. Owen, Morgan, Gambill & Owen, Fort Worth, Tex., for defendants.

MEMORANDUM OPINION AND ORDER

MAHON, District Judge.

## I. Background

Five years after the United States Supreme Court declared that "[s]eparate edu-

cational facilities are inherently unequal," in *Brown v. Topeka Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (hereinafter *"Brown I"*), two fathers of black children in the Fort Worth Independent School District filed this suit to desegregate its schools. On December 14, 1961, the dual racial system of the Fort Worth Schools was held to be unconstitutional and the school district was ordered by the Honorable Leo Brewster to submit a plan for desegregation within 30 days after final judgment. The District Court has retained jurisdiction over this action up to the present date for the purpose of overseeing the plan. *Flax v. Potts,* 204 F.Supp. 458, 461 (N.D.Tex.1962) *aff'd* 313 F.2d 284 (5th Cir.1963).

The first proposed comprehensive plan for desegregation was adopted by the Court in a modified form on May 3, 1963. During the twenty years that have passed since that first plan was adopted, it has gone through numerous modifications, amendments, and revisions, some voluntarily requested by the parties to the suit and others created by the District Court. Not unlike the metamorphosis of animals taught to students in the biology classes of the schools involved, the transformations of the original plan have, on occasion, represented clear departures from all prior plans.

When the Supreme Court rendered its decision in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) the Fifth Circuit, which was then considering an appeal of an order denying a motion for further relief in this case, directed the District Court to modify the existing plan in light of *Swann. Flax v. Potts,* 450 F.2d 1118 (5th Cir.1971). The District Court thereafter approved a modification of the plan on July 30, 1971. The modified plan was rejected on appeal, because of the continued existence of sixteen all-black and forty all-white

schools despite the adoption of some new school attendance zones. *Flax v. Potts,* 464 F.2d 865 (5th Cir.1972). As a result of the existence of the all-black schools in that plan, approximately two-thirds of the district's elementary age black children would be attending all-black elementary schools, while over 50% of the black middle school students and over 40% of the black high school students would be attending all-black schools. In accordance with the directions of the Fifth Circuit, Judge Brewster entered a memorandum opinion on August 23, 1973, modifying the comprehensive plan to include the all-black schools in the clustering, and approving the plan for the 1973–1974 school year.

The comprehensive plan which was approved in 1973, exactly ten years after approval of the first plan, represented a complete transformation of the earlier plans. It instituted affirmative desegregation devices of "clustering" and majority-to-minority transfers. It also required that faculty assignments to individual schools reflect the ratio of white to black teachers in the district as a whole, within a tolerance of 12% and it required the filing of bi-annual reports containing detailed racial data on each school in the district.

During the last ten years, following the Court's approval of the 1973 comprehensive plan, there have been additional modification and revisions of the plan including changing the teacher assignment plan to allow only a 10% tolerance; implementing magnet programs as a desegregation tool; and approving the agreement reached between the Mexican-American intervenors and the district, with additional modifications corresponding to that agreement.[1] The agreement reached between the Mexican-American intervenors and the district involved: (1) recognition of the Mexican-American students as a separate ethnic minority; (2) use of Spanish as well as English

---

1. On December 26, 1971 the Mexican-American plaintiffs were granted leave to intervene as a class in this action. The order granting intervention severed the issues raised in the Mexican-American intervenor Complaint from those involving the black class.

in policies, rules, and announcements at schools; (3) establishment of goal of 11% Mexican-American employment, with accompanying employment recruiting commitments; (4) in-service training and system-wide planning for Mexican-American needs, with triannual meetings between the Superintendent and the Mexican-American Advisory Committee; and (5) employment of both Mexican-American Assistant Superintendent and a Mexican-American Administrator in the personnel department.

In reviewing the "Joint Motion to Approve 1983 Amendments to Desegregation Plan" filed May 3, 1983, this Court notes that these proposed amendments, once again, represent such a radical transformation of the presently existing plan that they are, in reality, an entirely new plan instead of merely amendments to the old plan.[2]

## II. *The Court's Reviewing Authority*

The Fort Worth Independent School District's dual school system was held to be unconstitutional *de jure* segregation. In light of the finding of *de jure* segregation, this Court must exercise its broad equitable power to review and modify proposed remedies which are intended to create and maintain a unitary school system. Such broad power over this action will remain with the Court so long as the school district is under an affirmative duty to eliminate all "vestiges" of the prior discrimination, "root and branch" *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971); *Green v. County School Board,* 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1693–1694, 20 L.Ed.2d 716 (1968). That affirmative duty will continue until this Court makes a finding that the Fort Worth Independent School District is a unitary school system, no longer bearing the imprint of its prior discriminatory actions.

Under such broad equitable power, this Court may choose to reject any proposed

desegregation plan before it or it may choose to approve a plan in whole or in part, and to modify or amend that plan as the Court sees necessary. The Court may, in fact, order a plan of its own design if the proposals made in any plan submitted to the Court do not delineate such desegregation tools and techniques as would properly achieve desegregation. Thus, the Court will examine each of the proposed amendments in detail, keeping in mind the ultimate goal of achieving a unitary school system which offers quality education to all students.

## III. *The Proposed 1983 Amendments*

### A. *An Overview*

The proposed 1983 amendments are presented to the Court in a plan which is the end result of a procedure upon which this country places the highest importance—that of citizen participation in government affairs. The Board of Trustees, as elected officials of the Fort Worth Independent School District decided to go to the citizens of the district for advice on how it could further integrate and improve the school system. Eleven people were appointed to a "Citizens' Advisory Committee," with nine of those named by each of the nine members of the school board (seven of whom represent single member districts, and two of whom are "at-large" members) and two other citizens named by the plaintiffs and the intervenors in this suit. That committee of eleven citizens representing diverse backgrounds and interests from all areas of the school district devoted their time and energy for six months in an effort to answer the question: "What desegregation plan would produce the best possible educational opportunities for all of our children, whether they are black, or brown, or white?"

Their work was conducted independently. According to the evidence before the Court, they were not guided nor influenced by the

---

**2.** In 1975 this action was transferred to the docket of the Honorable Eldon B. Mahon from

the docket of the Honorable Leo Brewster.

Board or any other group, and were free to determine the direction they would take and the decision they would make. They did, however, on occasion request data and information from the Board and Administration which was readily provided to them without question. They unanimously reached an answer to the question above, and created a plan in which separate elements of desegregation tools and quality education techniques are inter-dependent. In fact, the separate elements are so intertwined, one cannot fully appreciate any single element without a consideration of its effects on and effects by all the other elements which make up the plan as a whole.

The plan created by the Citizens' Advisory Committee was then unanimously adopted and presented to the Board. After some minor changes discussed more fully below, the Board voted to present the plan to this Court for its approval.[3] The Court notes that these proposed amendments are today presented with the approval of *all* parties to the suit: the plaintiffs, the intervenors, and the defendant school district. All are in agreement that the Citizens' Advisory Committee did find an appropriate answer to their question.

Even upon first glance at the proposed 1983 Amendments, one is immediately impressed with the complete departure this plan makes from all previous ones. The demographics of the school district, with its necessary boundary line changes, clustering and pairing of schools, busing, majority to minority transfers, faculty and staff ratios, and magnet programs are all present, as it is imperative that they must be. This plan, however, presents a second factor to be given equal consideration with those desegregation tools listed above. That factor is the delivery of quality educational opportunities to all children in the district. The Court is aware that much has been written and said about "quality education" in recent years, and, therefore, different concepts may come to the minds of individuals who see that phrase used. Thus, a thorough examination of the quality education aspects of the plan will be discussed more fully below, in order to clarify the details of the concept involved in this case.

The Court is also aware that an argument may be made that any discussion or consideration of "quality education" has no place in the Court's review of a comprehensive plan proposed for desegregating the Fort Worth Independent School District. Such an argument would assert that only the desegregation tools and techniques discussed in the numerous desegregation cases following *Brown I* should be reviewed by this Court.

In response to that argument, the Court turns, once again, to the words of the Supreme Court in *Brown I* and examines the concerns of that Court. The basic premise of that Court's concern was expressed thus:

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

The words "quality education" do not appear in that paragraph, but this Court in-

---

**3.** According to the testimony of Mr. Jon Brumley, Chairman of the Citizens' Advisory Committee, the changes made by the school board were not significant ones, and all were within the spirit of the Committee's recommendations.

fers from that paragraph the need to offer an education of such quality as would be adequate, in fact, to awaken our children to cultural values, to prepare them for professional training, and to help them to adjust normally to their environment. Our schools must provide an education of such quality as to enable our children to succeed in life. That is, by definition, the very essence of our public school system.

The Court further notes that the Supreme Court quoted the following finding of a Delaware case in support of its own decision: "State imposed segregation in education itself results in the Negro children, as a class, receiving educational opportunities which are substantially inferior to those available to white children otherwise similarly situated." *Brown I*, 347 U.S. at p. 494, note 10, 74 S.Ct. at p. 691–692, note 10. Again, it appeared to be the *quality* of the educational opportunities that concerned the Supreme Court and led it to say that separate educational facilities are unequal, and thus, the public schools must be desegregated to provide equal educational opportunities to all. The end result of desegregating the schools, would, in the eyes of the Supreme Court, have been to raise the level of the *quality* of education offered to black children, not to lower the quality of education offered to all of the children.

If those nine justices sitting on the Supreme Court in 1954, were presented with a case in which a previously segregated school system had achieved complete desegregation, and was a unitary school system, but had done so by forfeiting the quality of education it offered each student, they would, in this Court's opinion, have been dismayed. Their vision, in 1954, was a school system that was *both* desegregated *and* offered quality education. That apparently was also the goal of the Citizens' Advisory Committee when it conceived the plan now before the Court.[4]

The Court, however, must add a word of caution concerning its review of this plan. There will be no compromising of the factor of desegregation in this plan. In other words, the elements of desegregation will not be weighed against the elements of quality education. Instead, the plan must represent further steps toward a more fully integrated system than has been achieved in the past, while at the same time adding the additional elements of quality education to the system.

## B. *Stand-Alone Elementary Schools*

The Citizens' Advisory Committee recognized that housing patterns in Fort Worth have changed dramatically in the twenty years since the first comprehensive desegregation plan was approved.[5] They knew from personal experience that many neighborhoods in Fort Worth had become natu-

---

**4.** The Citizens' Advisory Committee established the following objectives for their work on this plan:

   1. meet School Board and Court integration requirements

   2. increase the number of naturally integrated stand-alone schools

   3. decrease busing: number of pupils bused, average transportation time, and average distance bused

   4. shift dollars *FROM* building maintenance, administration, and transportation *TO* instructional improvements such as decreased class size and expanded counseling programs.

Defendant's Exhibit No. 22.

   The Citizens' Advisory Committee also set goals of: (1) closing the minority-majority gap in achievement; (2) monitoring the schools every year in order to assure that goals are being reached, to recognize new trends or problems which may occur in the future and which were not foreseen at the time this plan was written, and to make changes when and where necessary; (3) strengthening the transfer policy to make it stricter (4) avoiding disproportionate closings in minority areas; (5) avoiding putting the burden of busing on minority children; and (6) *insisting* that the money saved from school closings, less busing, etc. *must* go into the quality educational aspects of the plan, especially in the minority schools. *See* Testimony of Mr. Jon Brumley.

**5.** The Fort Worth Independent School District is the third largest school district in Texas, and one of the 50 largest districts in the United States. During the 1982–83 school year there were 65,125 students enrolled in the 69 elementary, 17 middle, 12 high, and 21 special schools

rally integrated during those years as blacks and whites have come to live side by side and form lasting friendships with each other. Additionally, they believed that a school located in an area that had become naturally integrated should be allowed to "stand-alone" in that neighborhood without the unnecessary aid of clustering, magnets or other desegregation tools. Thus, the Committee logically concluded that those areas which are now naturally integrated should be their first area of consideration in the creation of a new plan. They asked the plaintiffs in this suit for guidance in how to determine where the "naturally-integrated" neighborhoods are located. The plaintiffs responded that if a certain school population had at least a 20% to 30% minority population, it would be reasonable to consider that school naturally-integrated[6] and to allow it to "stand-alone."

Using this standard in their examination of present student populations and projected enrollments for the 1983–1984 school year, the Committee found *thirty* neighborhood elementary schools which could "stand-alone" as naturally-integrated schools. In a striking comparison, there are only *three* stand-alone schools under the present desegregation plan. It became apparent during the hearing before the Court, that the present desegregation plan, which is based on the demographics of the city ten years ago, has required busing in numerous instances where *blacks* have been bused along with whites *out* of their own naturally-integrated neighborhood into a predominately *black* school for the purpose of integration. Likewise *whites* have been bused along with blacks *out* of their own natural-ly-integrated neighborhood into a predominately *white* school for the purpose of integration. All parties before the Court were in agreement that there are obviously more efficient ways than those just described for spending tax dollars to achieve integration.

Once the Citizens' Advisory Committee located those thirty naturally-integrated neighborhoods, they saw the necessity of making certain boundary changes to accommodate those areas in stand-alone schools. Their investigation also revealed certain underutilized and/or older schools which could be closed, benefitting both the attendance of stand-alone schools, and the saving of money to place in quality education programs in minority areas.

The Court is aware of the concern that arises on the part of students, teachers, and parents when they face such a change in their lives as a closing of the school they have attended, taught in, or supported through the years. Therefore, the Court gives special consideration to the details of each of these closings.

### School Closings

In seeking to meet the established Objectives,[7] the Citizens' Advisory Committee examined the use of school buildings and determined that some should be closed. Several criteria indicated which buildings would best be closed:

1. whether the age and/or physical condition of the school facility demands expenditures beyond normal levels

2. whether schools in the area are underutilized (not counting portable building capacity)

---

and programs of that district, which covers an area of approximately 176 square miles.

In 1970 the FWISD had a total enrollment of 88,094 with 64% white, 27% black, and 9% Hispanic students. By 1982, the FWISD had a total enrollment of 65,125 with 42% white, 36% black, 20% Hispanic, and 2% others. The trend from 1980 until the present reveals a continued decline of white enrollment, continued increase in Hispanic enrollment, and a slight decline in black enrollment.

**6.** The word "minority" as used in this sentence was taken by the Court to mean the minority of students in any one school whether they were white or black. More specifically, the population of those schools considered "naturally-integrated" vary from 30% to 70% non-Anglo students, with the two exceptions of Burton Hill Elementary and Logan Elementary discussed below.

**7.** *See* Defendant's Exhibit 22.

3. whether a school location requires pupils to cross busy or otherwise hazardous streets

4. buildings for which utility costs are unusually high

5. areas where current and projected student enrollments are low

6. facilities wherein curriculum opportunities are limited

7. whether area ethnic balances would be enhanced for possible stand-alone schools

8. whether busing distances would be minimized

9. areas where boundary changes would result in more stand-alone schools.[8]

The Citizens' Advisory Committee gave primary importance to factors two, seven, and eight. A review of all of the factors reveals the complex interdependence of the whole plan. Student enrollment affecting the school closings also bears on the integration of the system and the quality of education in the schools. Creation of stand-alone schools and reduction in busing each affect student safety concerns. Costs saved in closing some buildings and in reducing busing can be applied to instructional improvements.

Of course, closing any school brings numerous complaints from those affected. The Court is very sympathetic to the concerns voiced by parents, and has considered each objection. This Court, however, must consider the entire school *system*—not just individual schools.[9] The goal for which we must strive is a unitary system with quality education. It is apparent from the presentation to the Court that this has been the goal of the Citizens' Advisory Committee in formulating the plan.

Nine elementary schools have been proposed for closing in the 1983–84 school year.[10] The recommendations of the Citizens' Advisory Committee were adopted with one exception. The Citizens' Advisory Committee recommended that # 48 Luella Merrett be closed. Instead, the school administration and the Trustees of the Board of Education have recommended to the Court that # 51 Wycliff be closed. This is due at least in part to a deed restriction on the land where # 48 Luella Merrett stands. The eight other schools recommended for closing are those unanimously proposed by the Citizens' Advisory Committee.

R. Vickery, school # 16, is suggested for closing. The building is slightly underutilized and is in need of physical renovation. The population studies indicate a continued decline in school age children. The students will attend Meadowbrook, school # 40, and Van Zandt-Guinn, school # 79. Meadowbrook is scheduled as a stand-alone school, and Van Zandt-Guinn is suggested for pairing with # 68 Bruce Shulkey. Closing # 16 with this planned distribution of students would not adversely affect continued integration of the Fort Worth school system.

The most underused building in the system is # 32, B.H. Carroll. The Citizens' Advisory Committee and the Trustees of the Board of Education propose to send the students from this area to # 44 Westcliff. This arrangement will create a stand-alone school. B.H. Carroll lies in an area of large underutilization of school buildings. Of the twenty-two most underutilized schools, nine are in this geographic area—from Vickery Boulevard south to the boundary of the school district and from 8th Avenue west to South Hulen. Seven of these underused buildings are in a contiguous area north of

8. *Id.*

9. The Court notes that the effects of school facility location are very far reaching, having an influence on patterns of residential development throughout the metropolitan area. *See Swann* 402 U.S. at 20–21, 91 S.Ct. at 1278–1279.

10. Two other schools will be converted to Early Childhood Centers, resulting in an actual reduction of elementary schools from sixty-nine to fifty-eight.

Interstate Highway 820. Three of these seven schools are proposed for closing, and one additional building south of the Interstate.

Alice E. Carlson, school # 37, is among this group of buildings. The indigenous enrolled student population [11] for area # 37 is less than half of the building capacity. Studies indicate a steady—and continuing—decline in the number of school age children in this area. Furthermore, building # 37 requires higher maintenance and utility costs than other buildings. Considering all factors, the cost per student for educating the students at Alice Carlson is the highest in the Fort Worth school system.

The Court would note that the parental support at Alice Carlson has always been particularly strong. The Court has received numerous suggestions for keeping this particular building open. As concerned parents and educators, we must together strive for quality education *throughout the system.* By closing Alice Carlson, the administration and the Trustees of the School Board impugn neither the quality of the school nor the integrity of the parents. The Court, however, must consider the proposed closing of Alice E. Carlson in light of the comprehensive plan submitted by the School Board.

Students from # 37, under the proposed plan, would attend Lilly B. Clayton, school # 19, and Tanglewood, school # 66.[12] Clayton would be a stand-alone school, and Tanglewood would be in a cluster with # 73 Como. This proposal appears to further the goals set forth by the Citizens' Advisory Committee, and advances the legal requirement of an integrated system.

Wycliff, school # 51, is suggested for closing. As stated above, the Board suggests this closing instead of # 48 Luella Merrett due to a deed restriction. In addition to the deed restriction on # 48, Luella Merrett is a larger building. The School Board suggests that students from # 51 will attend either Luella Merrett, which is paired with # 7 Morningside; or # 80 Benbrook, which is paired with # 82 Carroll Peak. This suggestion appears to advance the goal of integration.

Under the comprehensive plan, # 49 Bluebonnet will be closed and its students will attend # 44 Westcliff and # 66 Tanglewood. The former is suggested for stand-alone status, and Tanglewood is clustered with # 73 Como. Bluebonnet lies within the highly underutilized region mentioned above. Also, the cost per student for educating the students in Bluebonnet is one of the highest in the Fort Worth system. These factors support the recommendations of the Citizens' Advisory Committee.

West Handley, school # 53, also is suggested for closing. One factor in this proposal is the present underutilization of # 64 Eastern Hills. By closing # 53, a large segment of the student population will attend a school closer to home than previously.[13] Also, each of the new districts directly adjoins the school to be attended.[14] The proposal suggests that some students will attend # 64 Eastern Hills and # 39 East Handley. Both of these schools will achieve stand-alone status through the proposed consolidation. Other students will attend # 88 Atwood McDonald, which is proposed as a paired school with # 78 Maudrie M. Walton.

11. The school administration calculated the number of enrolled school age children living within the boundaries of each school attendance zone. Although there may be more children actually *attending* a particular school, this is due to students attending from outside the particular attendance zone.

12. It was noted at the hearing that there is also a deed restriction on building # 66. Although this apparently did not play any role in the recommendation of the Citizens' Advisory Committee, it is an important factor to consider.

13. *See* Defendant's Exhibit No. 9.

14. *Id.* Previously, some students attending # 53 West Handley, would cross through other school zones to reach the school.

The Citizens' Advisory Committee also proposed closing # 77 Carver-Hamilton. Although the school administration highly praised the staff at Carver-Hamilton, they supported this proposal with several factors. The area surrounding building # 77 is another of low building utilization. Carver-Hamilton is one of two schools in this area suggested for closing.[15] Population trends indicate continued decline in school age population. In addition, the indigenous enrolled student population in attendance zone # 77 is very low when compared with the capacity of building # 77. The building itself is almost 75 years old. The plan suggests that students within the present district # 77 will attend one of three schools. Versia L. Williams, school # 75, is scheduled to be paired with # 85 Western Hills. Likewise, ¶b 79 Van Zandt-Guinn would be paired with # 68 Bruce Shulkey. The remaining students will attend # 38 Oakhurst, creating a stand-alone school.

Number 84 Willis-Cartwright is proposed for closing. All students would attend # 62 Burton Hill, suggested as a stand-alone school. The racial mix of this school is highly dependent upon staff assignments at Carswell Air Force Base. Thus, any racial overbalance in this area is not due to vestiges of *de jure* racial segregation. This factor justifies making # 62 Burton Hill a stand-alone school. The larger capacity of building # 62 supports the choice of that building over building # 84. Future growth in the Burton Hill area, and the consolidation of these two areas suggest the larger building be retained.

Finally, # 87 J.P. Moore would be closed under the comprehensive plan proposed by the Citizens' Advisory Committee. The Court questions the wisdom of the original placement of this school facility. A look at the map shows that the Crowley School District is but a stone's throw from J.P. Moore. Only the gerrymandered form of the present attendance zone created a possi-

bility for this school to have a student population. The low indigenous student population of attendance zone # 87 can be readily absorbed by the surrounding schools.[16] A large portion of the students now attending # 87 J.P. Moore, would attend schools closer to their homes than they do now. Under this plan, each of the schools the students would attend is paired with another school: # 66 Tanglewood with # 73 Como; # 68 Bruce Shulkey with # 79 Van Zandt-Guinn; and # 45 J.T. Stevens with # 67 A.M. Pate.

These proposed school closings do not affect any one racial group more than another. Five elementary schools in predominately white areas are proposed for closing; two are in predominately black neighborhoods; two are in mixed neighborhoods.

Each of these proposed school closings must be considered in light of the goals for the entire school district. Of course, many parent groups will become highly upset because their *individual* schools are affected. This Court, however, must consider the effects of these proposals on the entire school district. The proposals have come from a committee of citizens and have been approved by the School Board. Beyond advancing the goal of eliminating the vestiges of *de jure* segregation, this portion of the comprehensive plan advances that goal for which all must strive—quality education.

### C. Clustering and Pairing of Elementary Schools

After establishing the thirty stand-alone neighborhood elementary schools, the Citizens' Advisory Committee then looked for ways to use the desegregation tools of clustering and pairing, busing, majority-to-minority transfers, and magnet programs with the remaining twenty-eight elementary schools. The Court would note here that it is extremely pleased when it compares Defendant's Exhibit 15A (the proposed busing

---

15. The other is # 16 Vickery. *See* discussion above.

16. These districts are part of the underutilized area mentioned above.

plan showing stand-alone schools as well as clusters) with Defendant's Exhibit 15B (the present busing plan showing stand-alone schools as well as clusters). When the Court looks at the two maps, the thirty naturally integrated stand-alone elementary schools are an impressive and encouraging sight in this district's attempt to desegregate its elementary schools, especially when compared to three stand-alone elementary schools under the present plan.

Under the present plan, black pupils are bused three to five years, while other pupils are bused one to two years to achieve integration in a total of 167 cluster routes. Under the proposed plan, majority and minority children would bear an equal burden in busing and no elementary school child would be bused more than one year. The number of cluster routes would be reduced to thirty-two as twenty of the remaining twenty-eight schools are paired and clustered.

The Citizens' Advisory Committee tried to "pair" schools instead of "cluster" them where possible. This would enable those students who were mixed by busing second graders from predominately white schools to predominately black schools to have the possibility of establishing friendships which could continue the following year as the third graders in the predominately black school were then bused to the same predominately white school that had sent its second graders to that black school the year earlier. Of a total of eight clusters, five of these are "pairings." Two of the other three clusters involve three schools each, and the last cluster includes four schools.[17]

As the Court noted above, it was extremely pleased when comparing stand-alone schools on the maps of the proposed plan (Defendant's Exhibit 15A) and the present plan (Defendant's Exhibit 15B).

That did not, however, lead this Court to accept the proposed patterns of clustering and pairing as the only way those remaining schools, which are not stand-alone, can be desegregated. In fact, the Court attempted to form its own pattern of clustering and pairing, hoping to create a better plan than the one proposed.

Without detailing the new clusters considered by this Court, the end result of its effort was the discovery that the Citizens' Advisory Committee and the Board have, in fact, created the best plan possible. Every time the Court thought it had found a new cluster that would better meet the needs of desegregation, it discovered some fatal flaw in the implementation of that cluster. For example, attempts to use less schools in some clusters reduced the desegregation effects below an acceptable level, or a shorter busing route between two schools in a new cluster would inevitably lead to a much longer and unacceptable busing route between two other schools that were then left to be clustered. Additionally, the capacities of all these schools placed a further limitation on the way the clusters could be arranged.

The proposed clustering and pairing of those twenty schools results in seven schools with 20% to 29% non-Anglo enrollments, six schools with 30% to 69% non-Anglo enrollments, four schools with 70% to 79% non-Anglo enrollments, and three schools with non-Anglo enrollments of 85% (Morningside), 82% (Van Zandt-Guinn), and 86% (Carroll Peak) See Defendant's Exhibit No. 6. In a comparison of those figures with the majority-minority enrollments of those same schools under the present plan (with 167 cluster routes and busing of children up to five years), the Court finds that twelve of the twenty schools will remain at about the same ratios (within six or seven percentage points of the present plan) or will

17. The need for all four schools to be clustered arose from the fact that Como Elementary School # 73 was a predominately black school with a large student enrollment and the predominately white schools closest to Como had much smaller student enrollments. It required the use of all three of those smaller white enrollments to achieve an integrated effect by clustering with Como.

actually have improved ratios under less busing and less clustering. Thus, this proposal by the Citizens' Advisory Committee and the School Board will further aid in desegregating the district, while at the same time freeing money from busing which can then be applied in instructional improvements.

## D. *Remaining Elementary Schools*

In addition to the thirty naturally-integrated, stand-alone schools and the twenty schools which are paired and clustered, there are eight remaining elementary schools in the proposed plan now before the Court. Five of those schools have predominately Hispanic populations. They are: # 3 Worth Heights (projected 86% Hispanic, 1% Black, 12% Anglo, 1% other). # 9 Nash (projected 77% Hispanic, 13% Black, 9% Anglo, 1% other); # 13 Circle Park (projected 90% Hispanic, 2% Black, 8% Anglo, 0% other); # 15 Denver Avenue (projected 87% Hispanic, 3% Black, 10% Anglo, 0% other); and # 26 Washington Heights (projected 67% Hispanic, 27% Black, 6% Anglo, 0% other).

There are several factors that must be considered when reviewing these five schools. First, there has never been a contention nor a finding by this Court that *de jure* discrimination against Hispanics has been practiced in the Fort Worth Independent School District, nor has there ever been a finding that the district violated the constitutional rights of Hispanics. Therefore, the school district is not under the same legal duty with regard to Hispanics that it is under with regard to Blacks. Additionally, it should be noted that the non-Hispanic enrollment in these five schools ranges from 10% to 33%, so that none are, in fact, entirely one-race schools.

A third factor to be considered is that the Citizens' Advisory Committee approached the Hispanic intervenors about these schools and were told the intervenors would prefer not to be bused and, instead, to have more money spent in their schools to im-prove the quality of their education. The Court is well aware that the desires expressed by the parties in a desegregation suit are not controlling factors in reviewing a proposed plan, but, in this particular case, it would be appropriate to consider this desire. That desire for quality education is addressed under the proposed plan by placing special funding in these five schools and monitoring the education offered there, to insure that it does, in fact, show improvement. This funding and monitoring will be discussed more fully below.

The last three elementary schools which are predominately Black and which have not been paired or clustered give this Court much more difficulty in determining their appropriateness in the desegregation plan of the school district. Once again, the Court turns to the United States Supreme Court for guidance. In *Swann v. Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1970) the Supreme Court stated:

> The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole .... [T]he use made of mathematical ratios was no more than a starting point in the process of shaping a remedy, rather than an inflexible requirement .... As we said in *Green,* a school authority's remedial plan or a district court's remedial decree is to be judged by its effectiveness. Awareness of the racial composition of the whole school system is likely to be a useful starting point in shaping a remedy to correct past constitutional violations. In sum the very limited use made of mathematical ratios was within the equitable remedial discretion of the District Court.

*Swann* at 24–25, 91 S.Ct. at 1280–1281.

The Court then goes on to discuss predominately one-race schools:

> Schools all or predominately of one race in a district of mixed population will require close scrutiny to determine that

school assignments are not part of state-enforced segregation.

In light of the above, it should be clear that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law. The district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools. No *per se* rule can adequately embrace all the difficulties of reconciling the competing interests involved; but in a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition. Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominately of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part.

*Swann* at 25–26, 91 S.Ct. at 1280–1281.

The three remaining elementary schools in this plan are # 43 Eastland, # 55 Mitchell Boulevard, and # 61 Dillow, with projected 96% black, 95% black, and 92% black enrollments respectively for the 1983–1984 school year. The Citizens' Advisory Committee as well as the Board considered the use of every possible desegregation tool in these schools and no feasible alternative was discovered. The Court notes that the most recent Bi-Annual Report (for the peri-od of May 28, 1982 through January 14, 1983) reveals a district-wide elementary school enrollment of 41% white students. Simply put, the white students no longer constitute a majority of the enrollment in the Fort Worth Independent School District. An attempt to further desegregate these three schools faces the inevitable stumbling-block that there are simply not enough white students left in the district to effect greater desegregation. In a recent case involving the Houston Independent School District, the Fifth Circuit recognized that the white enrollment had dropped to 26% of the total enrollment. There, the Fifth Circuit stated:

> [I]n seeking reduction in the number of one-race schools, the district court could not ignore diminished white enrollment in HISD and substantial immigration of Hispanic students.

*Ross v. Houston Independent School District,* 699 F.2d 218, 226 (5th Cir.1983).

In that case, the Fifth Circuit affirmed the District Court's finding that HISD had eliminated all vestiges of *de jure* segregation and had become unitary, in spite of the fact there were fifty-five predominately black schools and two all-white schools out of a total of 226 schools in the district. *Ross* at 226. In contrast the plan before this Court has no all-white schools (all elementary schools with a majority of white students have at least a 20% minority enrollment), and only three predominately black elementary schools.[18]

As stated above in *Swann,* this Court must scrutinize the three remaining predominately black elementary schools, to determine whether their racial composition is the result of present or past discriminatory action on the part of the school authorities. Those three elementary schools have previously been clustered, and through the clustering had achieved ratios showing they were desegregated. In contrast, twenty-two of the fifty-five predominately black

---

**18.** There are four additional predominately black schools in the plan before this Court. They are not elementary schools and will be discussed below.

schools in Houston had been predominately black continuously since 1960 and the other thirty-three schools became predominately black in the interim.

Also, the evidence before the Court suggests that changing demographics and housing patterns have caused the one-race concentrations, rather than any action on the part of school authorities. The Supreme Court, however, has suggested that actions of school authorities could affect housing patterns and promote segregation in that area. For example, they explained the school authorities in some cases had "closed schools which appeared likely to become racially mixed" and sometimes built new schools in areas "farthest from Negro population centers in order to maintain the separation of the races." *Swann,* 402 U.S. at 21, 91 S.Ct. at 1278.

The Court has seen no evidence of such actions on the part of the FWISD, and, instead, has observed a favoritism shown by the FWISD toward naturally integrated areas of the district, as seen in the present and the proposed stand-alone schools. Construction policies to prevent discrimination have been adopted and followed by the FWISD. Additionally, the FWISD has employed all tools of desegregation (boundary changes, gerrymandering, school closings, reorganizations and consolidations, clustering, busing, majority-to-minority transfers, and magnet programs) as well as desegregation of facilities, transportation, athletics, special programs, extra-curricular activities, and assignment of faculty and staff on the ratio principles of *Singleton.*[19] Thus, the Court finds that the racial composition of the three remaining black elementary schools is not the result of present or past discriminatory action on the part of the FWISD.

### E. *Proposed Pyramid Feeder System*

The proposed pyramid feeder system (Defendant's Exhibit 14) identifies all of the elementary schools which will "feed into" particular middle schools and the high schools that those middle schools will "feed into." With few exceptions, the students in a given elementary school will go to the same middle school and the students in a given middle school will go to the same high school. The benefits of such pyramiding have been described in three distinct areas.

First, educational benefits would arise through the possibility of cooperation between the teachers and staffs of all of these schools as a student moves from elementary to middle to high school. Second, disciplinary benefits arise as established policies of discipline could be applied and enforced at all levels of the pyramid. Third, and perhaps most important, social benefits to the students and their parents would arise as the student proceeds through a system which affords a basic continuity.

That continuity would mean friendships which were formed in early grades can continue through middle and high school. Also, parents will be more likely to know and be familiar with their child's friends and the parents of those friends throughout the child's public education if the same students are grouped together from kindergarten through high school. It has been suggested that many drug and behavior problems of students have been linked to a loss of contact with old friends when students from the same elementary school are sent to different middle schools, (or students from the same middle school are sent to different high schools) and parents find it difficult to become familiar with their child's new friends and the parents of the new friends.[20] This pyramid system could help alleviate that problem.

The Court considers this proposed amendment to the desegregation plan to be reasonable and easily attainable by adjusting

---

**19.** *Singleton v. Jackson Municipal School Dist.,* 419 F.2d 1211 (5th Cir.1968).

**20.** In recognizing such a need for continuity the proposed amendments include a provision allowing secondary students the option to return to the school they are presently attending, rather than a new school under the proposed plan, capacity permitting. The district will continue to furnish transportation for these students.

some secondary school boundaries. The adjustment of secondary school boundaries, set forth in the "Joint Motion to Approve 1983 Amendments to Desegregation Plan," includes adjustments to create the pyramid feeder system except where such a feeder system would interfere with integration or where it would cause capacity problems.[21]

Another factor in favor of the pyramid feeder system before the Court is its treatment of the three predominately black elementary schools which were discussed above. The students in Mitchell, Eastland, and Dillow Elementary Schools will attend McLean, Forest Oak, and Handley Middle Schools where the percentage of Anglo students is projected to be 66%, 29%, and 56% respectively. The only exception is a group of the students at Dillow who would attend James Middle School with a projected 15% Anglo enrollment. However, James Middle School will have a magnet in the Fall of 1983 which should result in a better ratio than the one projected.[22] This is an additional step toward desegregation of which the Court approves.

In addition to the secondary boundary changes which were made to create the pyramid feeder system and to further enhance natural integration, the proposed plan includes elementary boundary changes due to the closing of some schools, and the overcrowding of other schools, as well as to achieve further desegregation in the schools. Thirty-two elementary boundary changes are listed in the "Joint Motion to Approve 1983 Amendments to Desegregation Plan."

The Court, having compared the proposed elementary boundaries (Defendant's Exhibit 11) with the present elementary boundaries (Defendant's Exhibit 9) notes that there are fewer non-contiguous elementary school attendance zones under the proposed plan than under the present one. Also, the proposed plan will allow entering fifth grade pupils affected by the boundary changes to choose to attend their current school on a space-available basis. No transportation would be provided in these instances.

## F. Busing for Desegregation Purposes

Under the present plan 8,754 pupils are bused in 167 cluster routes. Under the proposed plan that would be reduced to 1,679 pupils being bused in 32 cluster routes. The Court sees three specific areas in which this reduced busing will, in fact, further the desegregation efforts of the Fort Worth Independent School District.[23]

First, this reduced busing awards those neighborhoods which have become naturally integrated by not requiring *any* busing for desegregation purposes of the students in those areas. They will be attending their neighborhood schools with their friends. Second, an unfair burden of busing now placed on black students (who are bused three to five years while others are only bused one to two years), will be removed under the proposed plan. All children who are bused will only be bused for one year. Third, all of the money saved from the reduction in busing will be used in improving the quality of education offered, especially in the minority schools.

With regard to the busing for desegregation purposes, in this proposed plan the Court is pleased that a substantial reduction

---

**21.** The Court takes judicial notice of TEX. EDUC.CODE ANN. § 23.26 (Vernon 1972) regarding the power of the school board trustees to close schools and re-arrange boundaries.

**22.** None of the projections of ratios and enrollments in the exhibits, briefs, and present opinion in this case, take into account the increased desegregation benefits which magnets will bring to some of these secondary schools.

**23.** In the FWISD, as in many other school districts across this state, busing for desegregation purposes comprises *less than half* of all busing in the district. All children who live further than two miles from their neighborhood schools must be provided transportation by the district under Texas law. The school district is partially reimbursed for such transportation expenses by state funds.

in the number of cluster routes and in the number of years a particular pupil will be bused can be made while achieving a result that is comparable to the present plan in terms of desegregation. However, the Court recognizes that the Committee faced a basic conflict between the goal of rewarding naturally-integrated neighborhoods with stand-alone schools and the goal of finding short busing distances for its cluster routes. They could eliminate some stand-alone schools and get shorter busing routes (sometimes without a substantial improvement in the student ratios even after the busing) or they could leave all stand-alone schools intact and accept a few longer busing routes. They chose the latter, which this Court finds to be appropriate under all the facts and circumstances presented to this Court. The plan will result in a 75% reduction of students bused for desegregation purposes.[24]

### G. *Quality Education*

When the Citizens' Advisory Committee created and presented its recommendations to the school board, it stressed that all of the changes described above must be accompanied by a corresponding improvement in the quality of educational opportunities, especially in the heavily minority neighborhoods. It has been projected that the school will save 1.5 million dollars through the reduced busing and school closings. The Citizens' Advisory Committee suggested that 40% of the money saved should be placed in those predominately minority schools which are not included in the clusters. Another 30% should go to the minority schools in clusters, and the remaining 30% to quality recommendations in other schools. The plan proposed by the trustees follows the Committee's suggestions with the exception that 20% instead of 30% of the funds will go to the minority schools

which are included in the clustering. The remaining 10% would then be set aside as a resource fund available to all schools submitting viable and acceptable proposals for school improvement. Any additional savings above the projected 1.5 million dollars would be added to the resource fund. Also, the 30% that the Committee suggested should go to quality recommendations in other schools is specifically directed by the Trustees' plan toward district-wide achievement goals in middle schools.

The 40% of funds which would go to predominately minority schools is to be spent on such elements as: (1) reduction of class size in pre-kindergarten through second grade, (2) employment of full-time counselors to work with the students in school and the parents in the neighborhood, and (3) employment of a full-time instructional specialist. It is undisputed that a reduction in class size offers the potential of increasing the time a teacher can spend with each student in a one-on-one situation. Additionally, educators today recognize that a vital element in the success of a student's education is the student's parents—offering both support and encouragement to the child and cooperation with the school. If the additional counselors to be employed in the predominately minority schools can reach the parents in those areas and work with them to form a combined effort for improving the educational opportunities, the chances of success for those children are greatly improved.

Under the proposed plan, Sagamore Hill Elementary and Kirkpatrick Elementary will become Early Childhood Centers, serving all pre-kindergarten, kindergarten, and first grade students from their own attendance areas as well as pre-kindergarten and kindergarten pupils from nearby areas. These would not be "day-care" type facilities, and would, in fact, be classrooms with

---

**24.** In order to implement this plan and to alleviate possible traffic hazards the Court recognizes the need for some limited busing for students living within two miles of the school they will be attending. Those areas requiring such busing are designated in Defendant's Exhibit # 19.

instructional materials for a learning environment. This effort to reach out and bring four year olds into the educational system is applauded by the Court. This should also bring the school district closer to its goal of closing the minority-majority gap in achievement.

Another part of the proposed plan includes the creation of new magnet schools. These would be in addition to already existing magnets. In September 1983, a magnet would start at William James and a Montessori program at a location to be selected. Additional magnets at McRae, Elder, Morningside, North Side, and Wyatt are projected for possible start-up in the fall of 1984. Other possible magnets would be considered for the fall of 1985. As a result of discontinuing the middle school cluster of # 153 Daggett, # 161 Morningside, and # 162 Wedgwood, the school district would develop magnet programs at Daggett and Morningside.

The Court sees two favorable results in these magnet schools. First, they would be placed in every secondary school with an enrollment of 20% or less Anglo and would further promote voluntary integration in these schools. Second, they would provide academic alternatives for both gifted students and those with special needs. The Court strongly encourages the school district to meet the needs of *all* of its students—not just the average students and those with learning difficulties, but also the students in the system who are gifted.

## H. *Transfers*

The proposed plan, as recommended by the Citizens' Advisory Committee, calls for a strengthening of its transfer policy. No transfers will be permitted out of second and third grades at cluster schools unless those transfers are to magnet schools. In other cases, transfers may be granted, if approved by school officials, into programs not offered at all schools, such as Montessori, Babysitting, and Day Care. These and other transfers would be on a space-availa-

ble basis, within goals for appropriate ethnic mix in both the receiving and sending schools. Child care would be made available at cluster schools wherever possible. Majority-to-minority transfers would be allowed under these conditions. The Court hopes this strong transfer policy will enable the school district to more quickly reach its goals for the desegregation of the district.

## I. *Monitoring*

The Fort Worth Independent School District is presently under a duty to file bi-annual reports containing detailed racial data on students and faculty at each school in the district. Under the proposed plan, that duty to file bi-annual reports will continue. However, additional monitoring must be ordered, to enable the school district, the parties to the suit, and this Court to determine if the proposed plan is succeeding in improving the quality of the education being offered. Annual reports must be filed with detailed data concerning the following areas of concern:

1. Minority-majority gap in each school and in the district;
2. Pupil achievement in schools involved in clustering;
3. Pupil achievement in high minority schools not included in clusters;
4. Pupil achievement in high minority schools included in clusters;
5. Pupil achievement in magnet schools.

Additional data must be provided to the Court and to the parties to this suit, giving a breakdown of the amount of money actually saved through reduced busing and school closings, the portion of that money expended in each school, the numbers of additional teachers and counselors provided by this money, the comparison of class sizes before and after the money is expended in these schools, and other details of the programs actually implemented and the results of those programs in a school-by-school analysis.

## IV. *Conclusion*

The Court hereby ADOPTS and APPROVES the 1983 Amendments to the De-

segregation Plan, attached as Appendix A to this opinion, which have been presented to the Court in a Joint Motion by Plaintiffs, Intervenors, and Defendants. The Court further ORDERS that all presently existing duties under the previous desegregation plan not specifically addressed and changed in the 1983 Amendments shall continue in full force and effect.

Having reviewed the plan in light of the numerous desegregation cases which have been litigated since *Brown I,* the Court believes the efforts behind this plan to be the finest example it has ever seen of the citizens of a community working with a school board as it accepts and fulfills its responsibility of complying with the law and the Constitution of the United States. The School Board allowed the Citizens' Advisory Committee the independence necessary to be innovative in its ideas. By continuing to go to the public for hearings and input on numerous occasions the School Board brought the entire community into this process.

The fact that eleven citizens of the community presented a unanimous proposal to the School Board, and the School Board, after making only a few minor changes to the plan, presented to this Court a "Joint Motion to Approve 1983 Amendments to the Desegregation Plan" joined by *all* parties to this suit, is, in this Court's opinion, the way that our government was meant to function. The School Board has undisputably made a good faith effort to follow the recommendations of the Citizens' Advisory Committee and has exercised its powers with the courage to do what it believes is right and in the best interest of the school district.

The Court would add some final words both of caution and of encouragement. While the Court is hopeful that this plan contains the possibility of a more fully integrated school system which offers quality education to all students, the Court also recognizes that the element of hope in this plan is not sufficient to insure its success.

Instead, the Court acknowledges that the success of this plan depends on the combined effort of the parents, teachers, students, administrators, trustees, and community as a whole.

This Court is well aware that there are parents, teachers, and students who do not agree with nor approve of various parts of the plan. The Court has made every effort to examine all details of the plan to determine what changes, if any, could be made for improvement. Its final decision to approve the plan without change rests first on the fact that the plan passes constitutional muster. Secondly, the plan furthers the goal of a unitary system with quality education for all students. In addition, this is a local plan, developed by the School Board in cooperation with all elements of the community. Such a voluntary plan is always more commendable and more readily accepted by the community than a plan which is created and ordered by some Federal Judge relying on desegregation "experts" from out-of-state or relying on his own limited knowledge of the intricate details by which a school system functions.

As parents join and support teachers in instructing their children, as teachers become role models for their students offering both inspiration and instruction for greater achievement, as the administrators and trustees make all decisions and take all actions with the best interests of the children in mind, and as the community businesses and individuals offer their full support to the school district, the district can fulfill the most important of all governmental functions—that of preparing our children for success in life.

## APPENDIX A

### 1983 AMENDMENTS TO DESEGREGATION PLAN OF THE FORT WORTH INDEPENDENT SCHOOL DISTRICT

The following amendments are proposed to the desegregation plan of the Fort Worth Independent School District:

APPENDIX A—Continued

### Clusters

Replace existing elementary school clusters with the following pairs and clusters. Majority and minority children will bear an equal burden in busing.

1.  *# 67 Pate*

    # 45 Stevens

    Pate will receive all second grade students from both schools. Stevens will receive all third grade students from both schools.

2.  *# 73 Como*

    # 47 Phillips (sends only)

    # 58 Ridglea Hills

    # 66 Tanglewood

    Como will receive all second grade students from Phillips, Ridglea Hills, and Tanglewood. Ridglea Hills and Tanglewood will receive third grade students from Como.

3.  *# 78 Walton*

    # 54 South Hills

    # 88 McDonald

    Walton will receive all second grade students from South Hills and McDonald. South Hills and McDonald will receive third grade students from Walton.

4.  *# 75 Williams*

    # 85 Western Hills

    Williams will receive all second grade students from both schools. Western Hills will receive all third grade students from both schools.

5.  *# 82 Carroll Peak*

    # 80 Benbrook

    Carroll Peak will receive all second grade students from both schools. Benbrook will receive all third grade students from both schools.

6.  *# 79 Van Zandt-Guinn*

    # 68 Shulkey

    Van Zandt will receive all second grade students from both schools. Shulkey will receive all third grade students from both schools.

7.  *# 7 Morningside*

    # 48 Merrett

    # 65 Waverly Park

    Morningside will receive all second grade students from Merrett and Waverly Park. Merrett and Waverly Park will receive third grade students from Morningside.

8.  *# 20 McRae*

    # 86 Westcreek

    McRae will receive all second grade students from both schools. Westcreek will receive all third grade students from both schools.

### Stand-alone Schools

Establish 30 elementary "stand-alone" schools. These schools are naturally integrated, without the necessity of busing, by virtue of the demographics of their neighborhood attendance areas. Boundary changes and the closing of some schools (more particularly set forth below) contribute to such natural integration. The proposed "stand-alone" schools are as follows:

| | | |
|---|---|---|
| #1 Springdale | #30 Sellars | #44 Westcliff |
| #4 North Hi Mount | #33 Hubbard | #50 Glen Park |
| #8 De Zavala | #34 South Fort Worth | #57 M. H. Moore |
| #10 Daggett | #35 Oaklawn | #59 Greenbriar |
| #12 Rosen | #36 Forest Hill | #60 Carter Park |
| #18 Clarke | #38 Oakhurst | #62 Burton Hill |
| #19 Clayton | #39 East Handley | #63 Green |
| #25 Diamond Hill | #40 Meadowbrook | #64 Eastern Hills |
| #27 Turner | #41 Howell | #76 Logan |
| #29 South Hi Mount | #42 Helbing | #81 Sunrise |

Establish the following 8 additional elementary "stand-alone" schools which will receive special funding and monitoring (as shown below):

| | | |
|---|---|---|
| #3 Worth Heights | #15 Denver Avenue | #55 Mitchell Blvd. |
| #9 Nash | #26 Washington Heights | #61 Eastland |
| #13 Circle Park | #43 Dillow | |

---

## Special Funding for Quality Education

It is projected that school consolidation and decreased busing will result in a saving of 1.5 million dollars during the 1983–84 school year. Money saved through school consolidation and decreased busing will be entirely directed toward quality education in the following manner: 40% to schools which at present would have a high minority attendance and where busing is not proposed; 20% to such schools where busing is proposed; 30% toward identified, district-wide achievement goals in middle schools; and 10% set aside as a resource fund available to all schools submitting viable and acceptable proposals for school improvement. Any funds available beyond the 1.5 million dollars would be added to the resource fund and allocated by proposals.

#10, #153 Daggett (K–8)
#20, #154 McRae – James (K–8)
#7, #161 Morningside

## Magnet Schools

Establish magnet programs at the following schools:

#197 J. P. Elder
#262 North Side (9–12)
#270 Wyatt (9–12)

---

New magnets at Wm. James (and for Montessori at a location to be selected) will be initiated in September 1983. Staff will work with each community to plan magnet programs in McRae, Elder, Morningside, North Side and Wyatt for possible start-up in the fall of 1984. Other possible magnet locations in addition to those listed above will be considered for start-up in the fall of 1985.

Discontinue middle school cluster of #153 Daggett, #161 Morningside and #162 Wedgwood. Develop magnet programs at Daggett and Morningside as above stated. Every secondary school with 20% or less Anglo will, thus, have a magnet program to promote voluntary integration and provide special academic alternatives.

## School Closings

Close 9 elementary schools and redistribute pupils to other schools. This contributes to the natural integration of the "stand-alone" schools listed above and, also, avoids wasteful underutilization of school facilities. The redistribution plan also avoids possible overcrowding in some schools. The schools to be closed and redistribution of students are as follows:

1. # 16 Vickery—pupils to # 79 Van Zandt-Guinn and # 40 Meadowbrook.
2. # 32 Carroll—pupils to # 44 Westcliff.
3. # 37 Carlson—pupils to # 19 Clayton and # 66 Tanglewood.
4. # 51 Wycliff—pupils to # 48 Merrett. Westpark area to go to # 80 Benbrook.
5. # 49 Bluebonnet—pupils to # 44 Westcliff and # 66 Tanglewood.
6. # 53 West Handley—pupils to # 39 East Handley, # 64 Eastern Hills, and # 88 McDonald.
7. # 77 Carver-Hamilton—pupils to # 75 Williams and # 38 Oakhurst.
8. # 84 Willis-Cartwright—pupils to # 62 Burton Hill.
9. # 87 J.P. Moore—pupils to # 45 Stevens, # 68 Shulkey, and # 66 Tan-

glewood (send pupils north of Loop 820 to Tanglewood).

### Diamond Hill/Jarvis-Carter Riverside High Schools

Central and building staff and community representatives from Diamond Hill/Jarvis and Carter Riverside High Schools will consider alternatives to consolidation of such schools which will address the Citizens' Advisory Committee's priority of increased academic electives, lower per pupil costs for such electives, and improved facilities.

### Secondary Boundary Changes

Adjust secondary school boundaries as follows, to enhance natural integration and create a "pyramid" feeder system except where there is interference with integration or where it causes capacity problems (maps showing the proposed boundary changes will be prepared and filed as exhibits):

1. Dunbar—Include the area east of Loop 820 (I–20) north of the Mansfield Hwy. to Eastland Rd. in # 164 Dunbar Middle, # 168 Dunbar Middle, and # 274 Dunbar High. This enhances ethnic balances in the Dunbar schools and strengthens enrollment.

2. Wedgwood/Southwest—Assign the Highland Hills community, south of Loop 820 (I–20) to # 162 Wedgwood Middle and # 260 Southwest High. This provides integration for the Wedgwood area schools.

3. Handley—Assign the area east of Loop 820 (I–20) from Willard Rd. north to Lancaster Ave. to # 163 Handley Middle. This builds on the pyramid system and enhances natural integration in the Handley area.

4. Paschal—Adjust the eastern boundary to I–35. Necessary to the pyramid feeder system.

5. Meadowbrook—Take the area west of Loop 820 (I–20) north of E. Rose-dale, and south of Meadowbrook Dr. to # 155 Meadowbrook Middle. This builds on the pyramid system and strengthens enrollment at Meadowbrook.

6. Monnig/Arlington Heights—Change the neighborhoods west of Guilford Rd. to Ridge Haven to Monnig Middle School and Arlington Heights High School. This pyramids in line with elementary change from Como to Ridglea Hills.

7. Arlington Heights—Change the Ridglea Country Club Estates, Mont Del, and Meadows West additions to Arlington Heights High. This pyramids Ridglea Hills Elementary School.

8. Meadowbrook Middle—Move students in the area east of Loop 820 to Sandy Lane north of I–30 to Meadowbrook Middle School. This pyramids Eastern Hills Elementary School.

9. Daggett Middle School—Extend the Daggett Middle School boundary east to I–35 to include the area previously assigned to Morningside Middle School. With the dissolution of the Daggett/Morningside/Wedgwood cluster, this will better balance enrollment between Daggett and Morningside Middle Schools.

10. Leonard/Western Hills—Move Lake Worth north and south shore students to Leonard Middle School and Western Hills High School. This pyramids in line with elementary changes of Lake Worth students.

11. McLean/Paschal—Move students from the Tanglewood area west of South Hulen to McLean Middle and Paschal High. This pyramids Tanglewood Elementary.

12. Como/Leonard/Western Hills—Move all Como Elementary students to Leonard Middle and Western Hills High at the secondary level, for

purposes of pyramiding and enhancing integration.

13. Elder/Meacham and North Side/Diamond Hill-Jarvis—Move the area west of Angle Ave. from # 157 Elder Middle to # 165 Meacham Middle, and from # 262 North Side High to # 265 Diamond Hill-Jarvis High. This carries out pyramiding.

14. Nash/Riverside—Move all # 9 Nash Elementary area students into Riverside Middle and High Schools at the secondary level. This carries out pyramiding.

15. Williams/Riverside—Move all # 75 Williams Elementary area students, except Butler Housing, to Riverside Middle and High Schools at the secondary level. This carries out pyramiding and enhances ethnic balance.

16. Van Zandt-Guinn/Monnig/Arlington Heights—Move all # 79 Van Zandt-Guinn Elementary area students to # 159 Monnig Middle and # 266 Arlington Heights High at the secondary level. This carries out pyramiding.

17. Phillips/Monnig—Move all # 47 Phillips Elementary area students to # 159 Monnig Middle at the middle school level. This carries out pyramiding.

18. Carter Park/Rosemont—Maintain all students in the Carter Park Elementary area in the Rosemont Middle district.

19. Morningside/Wyatt—Move all # 7 Morningside Elementary area students to # 270 Wyatt High, at the high school level. This balances change of Highland Hills students.

20. Vickery/Meadowbrook/Eastern Hills—Move all the # 16 Vickery Elementary area students north of Vickery, east of Hwy. 287 to # 155 Meadowbrook Middle and # 267 Eastern Hills at the secondary level. This carries out pyramiding.

21. Eastland/Dunbar—Move # 61 Eastland Elementary area students to # 274 Dunbar High, at the high school level. This corrects overcapacity problem at # 270 Wyatt High.

22. Hubbard/Rosemont/Paschal—Move all # 33 Hubbard Elementary area students to # 152 Rosemont Middle and # 261 Paschal High, at the secondary level. This carries out pyramiding.

23. Clarke/Rosemont—Move all # 18 Clarke Elementary area students to # 152 Rosemont Middle, at the middle school level, for purposes of pyramiding.

24. Allow secondary students the option to return to the school they are presently attending, capacity permitting. The district will continue to furnish transportation for these students.

*Elementary Boundary Changes*

In addition to boundary changes due to consolidation of schools, the following elementary schools will lose a part of their current attendance areas for reasons of achieving integration and/or to correct overcrowding (maps showing the proposed boundary changes will be prepared and filed as exhibits):

1. Morningside/Carroll Peak—# 7 Morningside Elementary to # 82 Carroll Peak Elementary.

2. De Zavala/Clayton—# 8 De Zavala Elementary to # 19 Clayton Elementary.

3. McRae/Oaklawn—# 20 McRae Elementary to # 35 Oaklawn Elementary.

4. Sagamore Hill/Logan/Meadowbrook—# 23 Sagamore Hill Elementary to # 76 Logan Elementary, # 40 Meadowbrook Elementary, and # 20 McRae Elementary.

5. Meadowbrook/Logan/Eastern Hills —# 40 Meadowbrook Elementary

**880**

to # 76 Logan Elementary and # 64 Eastern Hills Elementary.

6. Westcliff/South Hills/Tanglewood—# 44 Westcliff Elementary to # 54 South Hills Elementary and # 66 Tanglewood Elementary.

7. Wycliff/Benbrook—# 51 Wycliff Elementary to # 80 Benbrook Elementary.

8. Carter Park/Hubbard/Greenbriar—# 60 Carter Park Elementary to # 33 Hubbard Elementary and # 59 Greenbriar Elementary.

9. Shulkey/Stevens—Take the Parkwood area west of South Hulen from # 68 Shulkey Elementary to # 45 Stevens Elementary.

10. Green/Sunrise—# 63 Green Elementary to # 81 Sunrise Elementary.

11. Kirkpatrick/Washington Heights/Turner—# 71 Kirkpatrick Elementary to # 26 Washington Heights Elementary and # 27 Turner Elementary.

12. Williams/Howell—# 75 Williams Elementary to # 41 Howell Elementary.

13. Walton/East Handley/Eastern Hills —# 78 Walton Elementary to # 39 East Handley Elementary and # 64 Eastern Hills Elementary.

14. Sunrise/Walton—# 81 Sunrise Elementary to # 78 Walton Elementary.

15. J.P. Moore/Tanglewood—Move # 87 J.P. Moore area north of Loop 820 to # 66 Tanglewood Elementary.

16. Westcliff—Leave students south of South Drive and east through Inwood Road in # 44 Westcliff Elementary.

17. Van Zandt-Guinn/De Zavala—Take the # 79 Van Zandt-Guinn Elementary area west of I–35, south of Rosedale to # 8 De Zavala Elementary.

18. Eastern Hills—Make Sandy Lane north of I–30 the eastern boundary of # 64 Eastern Hills Elementary.

19. East Handley—Assign all areas east of Cook's Lane to # 39 East Handley Elementary.

20. Atwood McDonald—Assign all areas between Sandy Lane and Cook's Lane north of I–30 to # 88 Atwood McDonald Elementary.

21. Como—Move the neighborhood areas west of Guilford Road from Como Elementary to the Ridglea Hills Elementary area.

22. Van Zandt-Guinn/Carroll Peak—Make Rosedale the north-south dividing line between # 79 Van Zandt-Guinn Elementary and # 82 Carroll Peak Elementary.

23. Morningside/Daggett—Move children in # 7 Morningside Elementary west of I–35 to # 10 Daggett Elementary.

24. Carroll Peak/Daggett—Move children in # 82 Carroll Peak Elementary west of I–35 to # 10 Daggett Elementary.

25. Daggett/Clarke—Move children in area from Capps Street south between College and St. Louis Streets from # 10 Daggett Elementary to # 18 Clarke Elementary.

26. Clarke/South Fort Worth—Move children in area from Biddison south between Ryan and Hemphill Streets from # 18 Clarke Elementary to # 34 South Fort Worth Elementary.

27. South Fort Worth/Hubbard—Move children in area from Flint Street south from # 34 South Fort Worth Elementary to # 33 Hubbard Elementary.

28. Glen Park/Green—Move pupils from Miller Street east, as well as the area north of Knox Street, from

# 50 Glen Park Elementary to # 63 Green Elementary.

29. McRae/Dillow—Move children in area from Ayers Street east from # 20 D. McRae Elementary to # 43 Dillow Elementary.

30. Turner/Waverly Park—Move north shore Lake Worth pupils from # 27 Turner Elementary to # 65 Waverly Park Elementary.

31. Burton Hill/Waverly Park—Move south shore Lake Worth pupils from # 62 Burton Hill Elementary to # 65 Waverly Park Elementary.

32. Clayton/Tanglewood—Move the pupils west of University, south of Berry Street, from # 19 Clayton Elementary to # 66 Tanglewood Elementary.

33. Entering 5th grade pupils affected by boundary changes may choose to attend their current school on a space-available basis. No transportation will be provided.

### Transfers

Transfers may be granted, if approved by school officials, into programs not offered at all schools (e.g., Montessori, Babysitting, Day Care). These and other transfers would be on a space-available basis, within goals for appropriate ethnic mix, providing that any individual transfer does not jeopardize the ethnic mix of the sending or receiving schools. Child care will be made available at cluster schools wherever possible, and no transfers will be permitted out of second and third grades at cluster schools unless those transfers are to magnet schools. Majority-to-minority transfers would still be allowed under the above conditions.

### Busing Within Two-Mile Zone

Busing within the two-mile zone provided by state law will be provided where ordered by the Court as necessary to implement the desegregation plan. With the many changes being proposed for September, 1983, it is essential that a highly visible safety campaign be initiated to alert drivers and children to the new routes children may be following.

### Preschool Programs

Portable buildings will be located at schools serving pre-school children, if needed, so that 4-year olds do not have to be bused. Sagamore Hill Elementary and Kirkpatrick Elementary will serve all PK, K, and 1st grade students from their own attendance areas, as well as PK and K pupils from areas within easy and safe walking distance of the school. All PK and K pupils from # 26 Washington Heights Elementary would attend # 71 Kirkpatrick Elementary.

Consideration will be given for 1984–85 to "Schomes," i.e., the temporary purchase of homes from which preschool programs could be operated close to high concentrations of 4-year olds, thus removing the need for transportation.

Montessori 4-year old program will possibly be offered at the Montessori Magnet, with transportation provided by parents for students not in the immediate attendance area, on a tuition or scholarship basis for students outside the attendance area.

### Monitoring

Demography monitoring. Integration monitoring will be carried out annually to insure long-term adequacy of integration efforts and permit timely adjustments when necessary. The results of such monitoring will be shared with the parties and the Court.

Achievement monitoring. Careful monitoring of pupil achievement will be carried out with special attention given to:

1. Minority-majority gap in each school and district-wide;

2. Pupil achievement in busing schools involved;

3. Pupil achievement in high minority schools receiving the "40% quality package."

4. Pupil achievement in high minority schools receiving the "20% quality package."

5. Pupil achievement in magnet schools.

The results of such monitoring will be shared with the parties and the Court.