Arlene FLAX, et al.

v.

W.S. POTTS, et al.

Civ. A. No. 4–4205–E.

United States District Court,
N.D. Texas,
Fort Worth Division.

Sept. 27, 1989.

Leon Haley and Glenn O. Lewis, Forth Worth, Tex., William L. Garrett, Dallas, Tex., and Olivia Garcìa–Boullt, Fort Worth, Tex., for plaintiffs.

David B. Owen, Tom Carr and A. Bruce Wilson, Fort Worth, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

MAHON, District Judge.

The Fort Worth Independent School District (FWISD) moves the Court for a declaration that the school district is unitary. For the reasons stated below, the Court

finds that the former dual school system has been dismantled and that the vestiges of de jure segregation have been removed "root and branch."[1] While such a finding warrants the eventual end of federal court supervision, the Fifth Circuit's guidelines in *Youngblood v. Board of Public Instruction of Bay Co.* mandate that the Court retain jurisdiction over the case for three more years. 448 F.2d 770 (5th Cir.1971).

### Findings of Fact

1. These fact findings are based on the record of this case, now spanning almost thirty years, and the evidence adduced at a hearing held on the unitary-status issue beginning on April 12, 1989, and ending on April 20, 1989.

2. The history of the *Flax* case has been recounted several times during its long pendency and will not be repeated here. *See Flax v. Potts*, 864 F.2d 1157 (5th Cir.1989) (affirming order discontinuing limited busing for desegregation purposes); *Flax v. Potts*, 680 F.Supp. 820 (N.D.Tex. 1988) (opinion and order ending desegregation busing); *Flax v. Potts*, 567 F.Supp. 859 (N.D.Tex.1983) (opinion and order approving 1983 amendment to the FWISD desegregation plan).

3. The Mexican–Americans, intervenors in this action, do not oppose a finding of unitary status.

4. As a result of the work of the Citizens Advisory Committee in 1983, certain amendments to the then existing desegregation plan were proposed to the Court and approved.[2] *Flax*, 567 F.Supp. at 861–74. Under the 1983 Plan, five elementary schools were closed, 20 elementary schools were paired for desegregation (cluster) busing, 30 elementary schools were deemed "stand alone" under ratios defining integrated schools, and eight elementary schools, although attended by predominately minority populations, were left alone.

5. Of the eight minority-race elementary schools not subject to cluster busing in

---

1. *Green v. County School Board*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968).

2. Hereinafter referred to as the "1983 Plan."

1983, three had predominately black student populations. These three were Eastland, Mitchell Boulevard, and Dillow Elementary Schools. Prior to the 1983 Plan, these elementary schools had been clustered for desegregation busing purposes. The Court found that a diminishing white enrollment and changing demographics rendered the application of continued or alternative desegregation devices impracticable simply to maintain desegregation ratios. More importantly, the Court found that any resulting racial imbalance was not the product of past or present discriminatory action by the FWISD. *Flax*, 567 F.Supp. at 870-71.

6. In 1988, the Court was again called upon to make a similar determination about 8 predominately black schools which would no longer be subject to cluster busing. These eight elementary schools were Morningside, McRae, Pate, Como, Walton, Van Zandt–Gwen, Versia Williams, and Carroll Peak. The Court found that any effect that the termination of desegregation busing would have on these schools was "genuinely nondiscriminatory." *Flax*, 680 F.Supp. at 828. The Fifth Circuit Court of Appeals agreed, affirming this Court's decision that any concentrations of minorities in particular schools were not caused by discrimination but by population demographics. *Flax*, 864 F.2d at 1160–61.

7. The dual school system which was mandated by state law in the 1950's was dismantled in 1967. Not since that time has any student been excluded from a school in the FWISD based on race.

8. Since 1973, the school district has operated under a desegregation plan which complies with all of the principles prescribed by the United States Supreme Court in *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

9. The implementation of all desegregation devices under the 1973 and the 1983 Plans has resulted in the de facto creation of a unitary system in the FWISD.

10. Under the 1973 Plan, all elementary schools, except two which were naturally integrated, and six middle schools were involved in massive, cross-town busing. The 1973 Plan also instituted the "pyramid feeder system." Under this system, elementary schools "fed into" designated middle schools and middle schools "fed into" designated high schools. The attendance zones of middle and high schools were broader than those of the elementary schools. More encompassing attendance zones enhanced natural integration and generally offset those smaller racial imbalances, if any, in the elementary schools. While busing was used to achieve racial balances in elementary schools not naturally integrated, the middle and high schools acted a "melting pot" to achieve even a greater degree of desegregation.

11. Under the 1973 Plan, desegregation busing and the pyramid feeder system were not the only devices used to ensure full compliance with the *Swann* mandate. A majority-to-minority transfer policy was adopted. Liberal transfer policies which had allowed some escape cluster busing were eliminated. Equidistant principles were the guiding force when drawing elementary school attendance zones. To enhance integration, middle and high school attendance zones were redrawn to enhance integration. The Dunbar Complex or Community School was created. Multi-age grouping was utilized in particular classes or grades when busing or other *Swann* remedial tools could not alter circumstantial incidents of racial isolation.

12. Evidence adduced at the April 12, 1989 hearing demonstrated the success of the 1973 Plan as enhanced by the 1983 Amendments. Desegregation devices were utilized to achieve target racial balances in predominately one-race schools. Every de jure black school that existed under the dual school system and, particularly, every one of the 16 predominately black schools noted by the Fifth Circuit in its July 14, 1972 opinion, were beneficiaries of these desegregation devices. As reflected by their year-by-year racial composition, the desegregation devises employed in these schools were effective in integrating the schools.

13. During the 1970's and 1980's, residential living patterns did not remain stagnate. White enrollment in the school district dropped dramatically. More than 33,000 fewer white students were enrolled in the FWISD in 1984 than in 1968. The racial composition of the school district was no longer predominately white. By 1984, only 39.8% of the school district's enrollment was white. While the *number* of black students enrolled during the 1968–1984 period remained relatively constant, the *percentage* of black enrollment increased dramatically as white enrollment dwindled. The hispanic student population also increased steadily, from 6,947 in 1968 to over 18,000 in 1988.

14. Dramatic changes in residential living patterns have occurred throughout Fort Worth since the implementation of the desegregation plan. Some schools which had predominately white enrollments in the 1950's now have majority of black students. Other predominately white schools in the 1950's have been naturally integrated because of the continuing integration of residential neighborhoods. The trend toward natural integration continues throughout the school district. For example, Polytechnic and Wyatt High Schools had more than a 96% white enrollment in the 1960's. Yet by 1988, Polytechnic High School, even with its magnet program, had almost an 80% black enrollment; Wyatt, too, is now attended by a student population which is more than 80% black.

15. Since 1980, magnet schools have been developed and utilized as an indispensable tool in integrating the FWISD. The specialized instruction available at the magnet schools attracts students from all over the district, regardless of race. A modification to the 1973 Plan, ordered in 1980, added magnet schools at the Dunbar and Polytechnic High Schools and at the Dunbar and William James Middle Schools. The 1983 Amendments to the desegregation plan added magnet schools to Daggett Elementary and Middle Schools, Morningside Elementary and Middle Schools, D. McRae Elementary, Elder Middle, and North Side and Wyatt High Schools.

16. Magnet schools are a very successful means of meeting the school district's goals of quality education and integrated schools. More than 2500 students are currently enrolled in magnet schools which are located in predominately minority neighborhoods. Since their inception, magnet school enrollments have increased steadily. Any student wishing to attend a magnet school outside of the student's "home" school is afforded free transportation. Students whose "home" school hosts a magnet program may attend magnet classes.

17. An effective majority-to-minority transfer programs also exists to ensure that no student is locked into a racially identifiable school. Any student enrolled in a school in which his race is in the majority can simply make a request and be given a transfer to any other school in which his race is in the minority. Transportation to transferring students is provided free by the school district. A majority-to-minority transfer is a matter of right under the current desegregation plan and are not contingent upon a designated official's approval.

18. Absent desegregation busing, testimony at the April 12, 1989 hearing indicated that no additional remedial tools could be utilized to adjust the racial makeup of student assignments. School district officials testified that no vestiges of the dual system currently influence the racial composition of schools or employees, and if the district is declared unitary, no changes would be made other than to emphasize and redefine remedial programs already in existence.

19. The $1.5 million saved from the elimination of the massive desegregation busing of the 1970's has been spent on quality education programs in high-minority attendance schools who were not subject to the more limited cluster busing. Additional monies saved by the elimination of cluster busing in 1988 were designated for enhanced educational programs at those schools whose students, regardless of race, received the lowest achievement scores on the state-mandated TEAMS test.

20. Indicative of the school district's commitment to a complete uprooting of the old dual system are other programs voluntarily developed by the FWISD to achieve equal education opportunity. To name only a few, these programs include the Early Childhood Program, MS–2 Program, I Have a Dream, Grow Your Own, Adopt–A–School Program, C–Note Society to provide cultural arts experiences, a major anti-dropout program, and before-and-after-school child care for every elementary school in the district.

21. Integrated attendance zones are not the only substantial advancements made by the school district when eliminating racial discrimination. The school district can proudly boast that its professional and non-professional employees are fully integrated.

22. Since 1971, the FWISD's desegregation plan has required that the racial composition of the faculty and staff at each school in the district reflect the racial composition of the teachers and principals district-wide in each school category. Through the years, this ratio has never been permitted to vary more than 10% to 12% at any one school. In 1988, the variance rate of black to white faculty members was modified to permit a variance of up to 20% in any one school. Under the revised variance rate, any one elementary school could retain a 47 percent black faculty, or conversely, an 82 percent white faculty without violating the desegregation plan.

23. In 1980, the school district also adopted arduous employment goals. These goals contemplated that 30% black personnel would be employed in the following categories: central administrators, field administrators, site administrators, teachers, and support personnel. In the site administrator (principals and vice-principals) and support personnel categories, the school district has exceeded its goal where, respectively, 31.1% and 48.6% of the persons employed are black. Despite the diminishing pool of minority-race teachers and the fierce competition for them, 25.7% of the regular education teachers are black.

24. Racial composition of key supervisory positions in the FWISD is indicative of an administrative hierarchy that is well-integrated. The school district's brief submitted in support of unitary status describes the gains minority-race educators have made in obtaining supervisory positions which ensure an equal educational opportunity for students of all races in the FWISD.

In top administrative positions in the district, there are two associate superintendents, who are second in command to the superintendent. One is black and the other Hispanic. The Program Director for Health Services is black. The Program Director for adult education is black. The Program Director in vocational education is black. The Director of Magnet Programs is black. The Director of Accreditation is Hispanic. Two of the four administrators who support pyramids are black. The Coordinator for city-wide adolescent pregnancy services is black. The Coordinator for the day school for the deaf and all hearing-impaired programs is Hispanic. The Supervisor for budgets in special education is Hispanic. The Assistant Director for all special education programs is black. One of the two assistant directors in the athletics department is black. The Director of Elementary Education is black. Of the two assistant directors under him, one is Hispanic. The director of all curriculum development is black. The Director of bilingual programs and liaison for instructional programs having an impact on Hispanic students is Hispanic. The Program Director for Instructional Computing is black. The program directors for math, science, and physical education are black. The Director of Transportation is black. The Director of Affirmative Action (who reports directly to the superintendent) is black. The Director of Employee Staffing is black. The Director for Personnel Services is Hispanic. Thus, there are a substantial number of black and Hispanic administrators in the top echelons of administrators. Over prior years there have been other black associate or assistant super-

intendents. It is clear that race is no bar to holding top positions.

*Flax v. Potts*, CA4–4205–E, Defendants Brief filed August 22, 1989, at pp. 13–14.

25. The FWISD advertises open positions, and interviews are performed by a multi-ethnic panel and monitored by the Director of Affirmative Action.

26. The authority of the top administrative echelon of the FWISD is not unbridled. School officials must answer to an integrated School Board of Trustees. Seven members of the nine-member School Board are elected by popular vote within the single-member districts in which they reside. Two Board members, the president and vice president, are elected at-large. This method of election was mandated by the Texas Legislature in 1977, Tex.Educ.Code § 23.023 (Vernon 1987), and was approved by the Justice Department under the Voting Rights Act and by this Court in *Williams v. Leatherbury*, CA4–2444–E.

27. Since the enactment of section 23.-023, two black trustees have served on the School Board. In a city where the black population is about 20%, a School Board with a 22% black membership is consistent with Fort Worth's demographics. No black candidate has ever run for president or vice president of the School Board, but one of the present black trustees served as vice president by appointment to fill a vacancy created by a resignation.

28. All discrimination in areas of school transportation, extracurricular activities, and school facilities, was eliminated with the implementation of the so-called "stair-step" plan in 1967. No credible evidence was produced at the April 12, 1989 hearing which would suggest that any vestige of discrimination currently exists in these areas.

29. The Court takes judicial notice of a newspaper article which appeared in the final edition of the Fort Worth Star–Telegram on Thursday, March 16, 1989, which concluded that the FWISD spent an average of $332 more on each student in predominantly black schools than it did on those students attending predominantly white schools during the 1988–89 school year.

### Conclusions of Law

1. In *Brown I*, the Supreme Court of the United States held that government-mandated racial segregation in public schools violated the equal protection clause of the fourteenth amendment. *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). *Brown II* instructed the lower federal courts to use their broad equitable powers to eliminate obstacles to the transition mandated by *Brown I*. *Brown v. Board of Education*, 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955).

2. In *Griffin v. County School Bd.*, 377 U.S. 218, 234, 84 S.Ct. 1226, 1235, 12 L.Ed.2d 256 (1964), the Court stated that "[t]he time for mere deliberate speed [had] run out." Four years later, in *Green v. County School Bd.*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968), the Court established the lasting principle that schools boards "operating state-compelled dual systems were ... clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch."

3. Continuing court supervision of school districts spanning twenty-five years is not uncommon. At some point, however, federal court supervision of the public school system must come to an end. The threshold point is a finding that the "dual" school district has been converted to a "unitary" system in which every facet of school operations has been desegregated. *Green*, 391 U.S. at 435–38, 88 S.Ct. at 1692–94 (1968).

4. While the Supreme Court has not dealt explicitly with the termination issue, its decision to place other remedial burdens on the defendants in a school desegregation case also compels placing the burden of establishing unitariness on the defendant. *See* Gewirtz, *Choice in the Transition: School Desegregation and the Corrective Ideal*, 86 Colum.L.Rev. 728,

793 n. 209 (1986). Since a declaration of unitariness is essentially permission to change a desegregation plan at the discretion of the school officials, the burden of demonstrating that all vestiges are eliminated is borne by the defendant school district.[3]

█ 5. A district is unitary when it is devoid of racial discrimination in pupil assignment, faculty and staff, transportation, extracurricular activities, and facilities. *See Green*, 391 U.S. at 435, 88 S.Ct. at 1692–93. In each of these areas, the FWISD has completely dismantled the old "dual system" and removed its invidious vestiges. Today, the FWISD is free of any policy or practice of racial discrimination.

6. *Student Assignment.* Predominately minority race schools formerly subject to cluster busing have been found by the Court to exist because of nondiscriminatory reasons. The most prevalent reason has been the changing demographics of Fort Worth. Indeed, changing demographics rendered the limited desegregation busing under the 1983 Plan "an unreasonable attempt to achieve a complete homogenization of all students bodies." *Flax*, 680 F.Supp. at 831.

█ 7. The Supreme Court's mandate in *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 23, 91 S.Ct. 1267, 1279, 28 L.Ed.2d 554 (1971), makes it clear that the objective of a school desegregation plan "cannot embrace all the problems of racial prejudice, even when those problems contribute to disproportionate racial concentrations in some schools." Neither the Court nor the school district is "constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system." *Id.* at 32, 91 S.Ct. at 1284. Thus, the existence of some predominately minority race schools does not preclude a unitary finding.

8. De jure segregation has not existed in the FWISD since 1967. Prior to the implementation of expanded cross-town busing under the 1973 desegregation plan, 16 schools in the FWISD were predominately black. This number is comparable to the 22 of 226 schools in the Houston Independent School District which were predominately black in the 1960's. *See Ross v. Houston Independent School Dist.*, 699 F.2d 218, 226 (5th Cir.1983). The number of predominately black schools in the FWISD decreased dramatically when desegregation busing was increased under the 1973 plan. Only 5 schools in the FWISD had a black student population of 80% or more as of the 1982–83 school year. When cross-town busing was greatly curtailed under the 1983 amendments, the number of predominately black school rose accordingly.

9. Currently, of the 98 schools in the district, 14 have student populations which are more than 80% black. This is in sharp contrast to the Houston Independent School District where, at the time the district court declared the school system unitary, 55 of the 226 schools were predominately black, an *increase* of 33 schools during the period of federal court superintendence. *Id.* at 226.

10. Other circuit courts have made it clear that "[u]nitary status is not simply a mathematical construction." *Morgan v. Nucci*, 831 F.2d 313, 321 (1st Cir.1987). In *Morgan*, the court found that the racial imbalance in 13 Boston schools was "rooted not in discrimination but in more intractable demographic obstacles." *Id.*

11. The record in this case is replete with similar findings that any racial imbalance in the schools of FWISD are not the result of past or present segregative practices but of changes in residential housing patterns. "[S]chool Officials who have tak-

---

**3.** *See, e.g., Green*, 391 U.S. at 439, 88 S.Ct. at 1694–95 ("The burden on the school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now.... It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation.").

en effective action have no affirmative fourteenth-amendment duty to respond to the private action of those who vote with their feet." *Ross*, 699 F.2d at 225.

12. Changing demographics also indicate an encouraging trend in the natural integration of residential neighborhoods. Neighborhoods which were virtually all-white in 1970 are becoming more and more integrated according to 1980 census figures. As demonstrated by Appendix A, 11 neighborhoods which were previously subject to cluster busing are experiencing increasing minority enrollments.

13. *Faculty and Staff.* Since the implementation of the 1971 plan, the school has had a plan for faculty and staff assignments which meets the constitutional mandates of *Singleton v. Jackson Mun. Separate Schools*, 419 F.2d 1211, 1217–18 (5th Cir.1970), and *Green*, 391 U.S. at 435, 88 S.Ct. at 1692–93. The record developed in this case is uncontroverted that since 1971 the FWISD has maintained faculty and staff assignments at each school which reflect the racial composition of teachers and principals district-wide. The same principle remains in force as part of the desegregation plan today, with only minor adjustments having been allowed over the years. Currently, the application of this district-wide ratio may vary no more than 20% in any one school.

14. The FWISD operates under race-conscious employment goals, and black educators and administrators currently occupy numerous and various positions throughout the school district. All phases of hiring and assigning faculty and staff are free of discrimination on the basis of race in the FWISD.

15. *Transportation, Extracurricular Activities, and Facilities.* Racial discrimination in the areas of transportation, extracurricular activities, and facilities was eliminated with the implementation of the so-called "stair-step" plan in 1967. The Court can recall no allegation of discrimination in

these areas since 1970, when Judge Brewster's order approving the construction of a high school was reversed by the Fifth Circuit Court of Appeals with instructions to enjoin its construction in the predominately black Morningside-area.

16. Except for the Morningside High school issue in 1970, the Court can recall no intimation by the plaintiffs suggesting that discrimination exists in any aspect of extracurricular activities,[4] athletics, or school transportation. Moreover, no allegation has been made that any school buildings are of inferior quality or more poorly equipped or maintained than any other school in the district.

17. *Plaintiffs Complaints.* The plaintiffs had several criticisms of the current desegregation plan but adduced no evidence indicating discriminatory practices in, or suggesting remedial measures for, any of the areas of which they complained. The Fifth Circuit has made it clear that mere unsubstantiated complaints will not suffice for probative evidence, especially when the school district has implemented exhaustive remedies to desegregate the school system.

> In the adversarial system mandated by the Constitution, Art. III, Sec. 1, it is the duty of the parties to assert their position, to adduce evidence, and, in institutional litigation, to suggest remedial measures. It does not suffice under the circumstances for the lone dissenter from the court's order simply to assert that more evidence must be studied and more plans must be considered.

*Ross*, 699 F.2d at 227. *See also Flax v. Potts*, 464 F.2d 865, 866 (5th Cir.1972) ("[T]he [plaintiffs] objections have been numerous but their contributions negligible.").

■ 17. First, there was testimony of concern over student achievement test scores which indicate that the black and hispanic students generally place lower

---

**4.** During the April 12, 1989, hearing, Mr. Bell testified about a complaint he had received regarding the cheerleader selection process at one high school. Mr. Bell had no personal knowledge of the incident and his testimony was based solely on hearsay. The director of affirmative action, Dr. Murphy, testified that he had investigated the incident and found no evidence of discriminatory practices in the cheerleader selection process at the high school.

than their white counterparts. While comparative achievement test scores are not usually considered part of the vestiges of a dual system, *School Board of the City of Richmond v. Baliles*, 829 F.2d 1308, 1314 (4th Cir.1987), the Court promises to carefully monitor minority student achievement scores during the continued pendency of this case and certainly before its dismissal. In the *Baliles* case, the Fourth Circuit of Appeals held that a school desegregation plan could not remedy all societal ills which affect the student population. *Id.*

18. As the Supreme Court stated in *Swann*, 402 U.S. at 22, 91 S.Ct. at 1279, "One vehicle can carry only a limited amount of baggage." Poor achievement scores are often an incidence of poverty and family environment, matters not remediable by a school desegregation plan.

19. Second, there was testimony presented about a racial imbalance in the faculty and staff assignments at some schools. This testimony appeared to be based on erroneous information. As fully explained above, the school district operates under stringent faculty and staff assignment ratios, and top-level administrative positions throughout the school system are held by persons of a minority race.

20. Third, there was also testimony about allegedly "disproportionate numbers" of black student expulsions. However, the evidence is uncontroverted that the student discipline in the FWISD is imposed under the provisions of the Texas Education Code which provide a number of procedural protections for any student expelled. These procedures include procedural due process and appeals. Dr. Murphy, the director of affirmative action, testified that there was no evidence that the higher rate of black student expulsion was created or designed by the school district. More importantly, no evidence was presented of: (1) an expulsion of any specific student based on race or (2) the implementation or operation of a biased disciplinary process in any particular school.

21. Finally, there were complaints about the current method of electing school trustees in the FWISD. As already discussed, the current election system, whereby seven trustees are elected from single member districts and two trustees from at large, has been approved by the Justice Department and this Court in *Williams v. Leatherbury*, CA4–2444–E.

### ORDER

In sum, the defendant FWISD has met its burden of proving that the school district is unitary in every respect, except for the existence of a homogeneous student population which is not constitutionally required when the school district has made intensive efforts to eliminate one-race schools and further measures would be both impractical and detrimental to education.[5] The essentially uncontroverted evidence adduced at the unitary status hearing demonstrated that the FWISD has no policy or practice of discrimination in student, faculty, or staff assignments, or in student transportation, extracurricular activities, or school facilities.

The implementation of the FWISD's desegregation plan encourages the belief that seemingly intractable problems yield to citizen action through government. The tireless dedication of the school district's trustees, officials, and employees in eliminating all vestiges of discrimination holds the promise that the district will continue to match the remedy even more closely to what are now the unmeasurable sins of the past. Under these circumstances, the inevitable end of court supervision in no way indicates that the school district will minimize the use or implementation of all available and practical remedial desegregation tools.

 Declaring the system unitary while retaining supervision of it for three more

---

5. *See Flax v. Potts*, 864 F.2d 1157, 1160–61 (5th Cir.1989) (termination of desegregation busing was a natural and legitimate response to: (1) increased integration of residential neighborhoods, (2) the need for local control over the quality of education, and (3) the opportunity to stabilize the racial composition of school district as a whole, thereby creating more residential integration.)

years (which includes the FWISD continuing its semi-annual reports to the Court) reaffirms this Court's commitment to ensuring that school officials maintain a singular school district. Thus, the Court DECLARES that the FWISD is unitary and that the district now enters the three-year transitionary period under the Fifth Circuit's *Youngblood* decision.[6] A declaration of unitary status ends the presumption that any disparities in the school system are causally related to prior segregation, and the burden of proving otherwise now rests on the plaintiffs.[7]

It is so Ordered.

## EXHIBIT A
### TREND TOWARD NATURAL INTEGRATION
(percentages of white students)

| Elementary School (Number) | 1970 | 1980 | 1987 | 1988 | Increase in Student Enrollment for 88-89 School Year |
|---|---|---|---|---|---|
| Stevens (45) | 99% | 91% | 78% | 76.6% | +130 |
| Phillips (47) | 98% | 80% | 73% | 64.6% | + 81 |
| Merrett (48) | 98% | 88% | 77% | 77.3% | + 28 |
| South Hills (54) | 98% | 69% | 67% | 66.7% | + 75 |
| Ridglea Hills (58) | 98% | 92% | 82% | 85.3% | + 91 |
| Waverly Park (65) | 99% | 89% | 88% | 86.1% | + 43 |
| Tanglewood (66) | 99% | 99% | 87% | 90.0% | + 14 |
| Bruce Shulkey (68) | 98% | 78% | 74% | 72.6% | + 72 |
| Benbrook (80) | 99% | 88% | 82% | * 82% | +107 |
| Western Hills (85) | 99% | 82% | 64% | 65.8% | + 67 |
| West Creek (86) | 99% | 78% | 72% | 73.2% | +147 |
| | | 76.73% Average for 1987 | | 76.85% Average for 1988 | +855 |

* Benbrook student body split into two schools; Westpark, a newly constructed elementary school (77% white) and Benbrook (87% white)

---

**6.** In no event, however, will the Court dismiss this case without notice to the plaintiffs and a hearing providing an opportunity for them to show cause why dismissal of the case should be further delayed.

**7.** *See Baliles,* 829 F.2d at 1311; *Riddick v. School Board,* 784 F.2d 521, 538 (4th Cir.1986).